**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**ELIZABETH A. MOWERY,**

> **Plaintiff,**

**v.**                                                    **Case No. 6:22-cv-2314-ACC-LLL**

**COMMISSIONER OF SOCIAL
SECURITY,**

> **Defendant.**

_____

**ORDER**

This cause is before the Court on the Complaint of Plaintiff Elizabeth Mowery seeking review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Supplemental Security Income ("SSI") under the Social Security Act. See 42 U.S.C. §§ 405(g), 1383(c)(3). (Doc. 1). The United States Magistrate Judge has submitted a report recommending that the decision of the Commissioner be affirmed. (Doc. 25).

After an independent *de novo* review of the record in this matter, including the Objections filed by Plaintiff Mowery (Doc. 26) and the Commissioner's Response[1] (Doc. 27), the Court agrees entirely with the findings of fact and

_____

[1] The Commissioner's Response to Plaintiff's Objections (Doc. 27) incorporated the Commissioner's original responsive arguments (Doc. 22), recognizing that Plaintiff's Objections overlapped extensively with her original briefing.

conclusions of law in the Report and Recommendation, and the Commissioner's decision will be affirmed.

## I.   BACKGROUND

The Court briefly sets forth the relevant procedural history. On September 18, 2019, Plaintiff filed her application for SSI benefits, alleging disability beginning on August 1, 2019, when she was 51 years old, due to neuropathy in both feet, strokes, spinal stenosis, arthritis, diabetes, high blood pressure, chronic obstructive pulmonary disease ("COPD"), anxiety, bronchial problems, asthma, severe foot pain, chronic knee pain, vein blockage, and a heart issue. R. 125, 140, 319.

After her application was denied initially and on reconsideration, on February 17, 2022, an Administrative Law Judge ("ALJ") held a hearing at Plaintiff's request. R. 102-23, 139-64, 167-78. Considering Plaintiff's age, education, work experience as a merchandise distributor, and residual functional capacity, the ALJ determined that Plaintiff could perform light work with additional limitations, and, although she was unable to perform any past relevant work, there were jobs existing in significant numbers in the national economy that she could perform, including office helper, mail clerk, and bench worker. R. 79-95. On March 29, 2022, the ALJ issued a decision finding Plaintiff not disabled through the date of the decision. R. 74-101. Plaintiff appealed the ALJ's decision to the Appeals Council, which denied Plaintiff's request for review on October 4, 2022, and

granted a thirty-day extension for filing of a civil action. R. 5, 10-16. Thereafter, on December 13, 2022, Plaintiff filed her Complaint in this Court. (Doc. 1).

## II. LEGAL STANDARDS

### A.    Review of Magistrate Judge's Report & Recommendation

In the Eleventh Circuit, a district judge may accept, reject or modify a magistrate judge's report and recommendation after conducting a careful and complete review of the findings and recommendations. 28 U.S.C. § 636(b)(1); *Williams v. Wainwright*, 681 F.2d 732, 732 (11th Cir. 1982). A district judge must conduct a *de novo* review of the portions of a magistrate judge's report and recommendation to which a party objects. 28 U.S.C. § 636(b)(1)(C). The district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations" made by the magistrate judge. *Id.* This requires that the district judge "give fresh consideration to those issues to which specific objection has been made by a party." *Jeffrey S. v. State Bd. of Educ.*, 896 F.2d 507, 512 (11th Cir. 1990) (citing H.R. Rep. No. 94–1609, 94th Cong., 2nd Sess., *reprinted in* 1976 U.S.Code Cong. & Admin. News 6162, 6163). A district judge reviews legal conclusions *de novo*, even in the absence of an objection. *See Cooper–Houston v. Southern Ry.*, 37 F.3d 603, 604 (11th Cir. 1994).

### B.    Social Security Sequential Evaluation Process

When an ALJ makes a disability determination, the ALJ follows a five-step evaluation process: (1) whether Plaintiff is currently performing substantial gainful

activity; (2) whether Plaintiff has a severe impairment or combination of impairments; (3) whether the severe impairment meets or exceeds an impairment in the Listings of Impairments; (4) whether the Plaintiff can perform her past relevant work despite the impairment; and (5) whether Plaintiff can perform other jobs that exist in the national economy given her residual functional capacity ("RFC"), age, education, and work experience. *Simon v. Comm'r, Soc. Sec. Admin.*, 7 F.4th 1094, 1101–02 (11th Cir. 2021)[2]; 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Plaintiff has the burden of proof on the first four steps; the Commissioner carries the burden on the fifth step. *Goode v. Comm'r of Soc. Sec.,* 966 F.3d 1277, 1279 (11th Cir. 2020).

The Eleventh Circuit has explained that, in Social Security appeals, the court "must determine whether the Commissioner's decision is supported by substantial evidence and based on proper legal standards." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* The court "will affirm the Commissioner's decision if it is supported by substantial evidence, even if the preponderance of the evidence weighs against it." *Buckwalter v. Acting Comm'r of Soc. Sec.*, 5 F.4th 1315, 1320 (11th Cir. 2021). Under this limited standard of review, a court must not make fact-

---

[2] *Simon* was superseded on other grounds by 2017 regulations abrogating the treating physician rule. *See Harner v. Soc. Sec. Admin., Comm'r,* 38 F.4th 892, 894 (11th Cir. 2022).

findings, re-weigh the evidence, or substitute its judgment for that of the ALJ. *See id.*

### III. PLAINTIFF'S OBJECTIONS

Plaintiff's objections to the ALJ's decision, and the Magistrate Judge's Report & Recommendation affirming that decision, focus on four main issues. Plaintiff's Objections restate four of the five arguments she made in the original briefing, albeit it slightly streamlined. *Compare* Doc. 26 at 1-2 *with* Doc. 15 at 5-20. Plaintiff argues essentially that the ALJ failed to properly evaluate: (1) the testimony of the vocational expert ("VE") regarding other jobs in the national economy Plaintiff could perform; and (2) the walking/standing components of the three cited jobs; (3) Plaintiff's subjective physical complaints; and (4) the consultative psychologist's opinion. (Doc. 26). The Commissioner responds that Plaintiff inappropriately asks the Court to "play the role of the ALJ and reweigh the evidence." (Docs. 22, 27). The Court first addresses Plaintiff's RFC, the evidence supporting it, including her subjective complaints and the opinion of the consultative psychologist, and then turns to the VE's testimony.

### A. Objections Related to Plaintiff's RFC and Subjective Complaints

The ALJ found "in light of Plaintiff's pain and tenderness, she is limited to light exertion, standing and/or walking 4 hours out of an 8-hour workday, occasionally climbing, occasionally balancing, stooping, kneeling, crouching and

crawling, and tolerating frequent exposure to vibrating surfaces, tools and workplace hazards; with additional mental limitations (discussed in § B *infra*). R. 82, 89.

Plaintiff argues that in determining her RFC, the ALJ failed to properly evaluate her complaints of pain and numbness in her foot and leg, along with other diabetes or vascular complications, which required her to use a cane. (Doc. 26 at 20-21). She objects to the portion of the Report and Recommendation ("R&R") finding that the ALJ fairly considered Plaintiff's cane usage unnecessary because, she argues, some of the medical records cited in the R&R described a swollen right leg, venous insufficiency of the leg, and foot and leg numbness, all of which she contends support her use of a cane; she also points to a physician's suggestion (Dr. Carter of the North Jefferson Medical Center) that she use a cane. (*Id*.). She points to medical records showing that she had a fracture in her right great toe, for which doctors recommended she wear a boot, as well as complaints of leg swelling, numbness, and pain, foot pain, headaches, and loss of vision. (*Id*. at 21 (citing R. 88, 1314, 1340, 1368)). The Commissioner argues that the ALJ properly incorporated Plaintiff's subjective complaints in partially limiting Plaintiff to a reduced range of light and simple work with specific limitations and determined Plaintiff's other subjective allegations were inconsistent with the objective medical evidence. In the R&R, Magistrate Judge Lambert thoroughly addressed the point Plaintiff now raises in objection—Dr. Carter's suggestion that Plaintiff use a cane—finding that the ALJ

had specifically considered Dr. Carter's opinion on that issue and found it not persuasive. (Doc. 25 at 12, 17).

To establish a disability based upon a complaint of pain, a claimant must show: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain, or (b) the objectively determined medical condition can be reasonably expected to give rise to the claimed pain. *Raper v Comm'r of Soc. Sec.*, 89 F.4th 1261, 1277 (11th Cir. 2024) (quoting *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002)). "The claimant's subjective testimony supported by medical evidence that satisfies the standard is itself sufficient to support a finding of disability." *Id.* (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (per curiam). "[I]n certain situations, pain alone can be disabling, even when its existence is unsupported by objective evidence." *Id*. (quoting *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995)).

"If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so." *Wilson,* 284 F.3d at 1225. "Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true." *Id.* (citing *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988)). A reviewing court will not disturb an ALJ's clearly articulated credibility finding that is supported by substantial evidence on the record. *Foote*, 67 F.3d at 1562 (citation omitted). Moreover, there is no requirement that the ALJ specifically refer to every piece of evidence in her decision, so long as the reviewing

court can conclude the ALJ considered the claimant's medical condition as a whole.

*Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam).

In this case, the ALJ applied the correct standard and addressed in detail Plaintiff's subjective complaints by citing to specific medical records and statements in the records:

> In the disability report, the claimant stated that neuropathy in both feet, two stroke[s], spinal stenosis, arthritis in both knees and back, diabetes, high blood pressure, COPD, anxiety, bronchial issues, asthma, severe pain – feet, chronic pain – knees, vein blockage and hole in the heart, limited her ability to work. (Exhibit 2E)
>
> In the function report, the claimant stated that she lived with family. She stated that she has physical issues with dressing and showering. However, she had no issues in other areas of personal care. She can prepare simple meals. She can keep up laundry. She can shop for groceries. She can manage finances. She spends time with others. (Exhibit 6E)
>
> In the pain questionnaire, the claimant stated that her spinal stenosis cause[s] severe pain in her neck, shoulder, back and head. (Exhibit 15E) . . . . In a second cardiac questionnaire, dated June 27, 2021, the claimant stated that she does not have any chest discomfort. She stated that she has shortness of breath. She stated that she does not go for walks anymore. (Exhibit 26E) In the disability appeal report, the claimant stated that she can barely walk. She has pain in her hips. She gets dizzy. (Exhibit 30E)
>
> At the disability hearing [on February 17, 2022], the claimant testified that she is fifty-three (53) years old. She is not currently working. She stated that she stopped working in 2018. . . . She stopped working due to knee, back and feet pain. She stated that she has arthritis. She has neuropathy in the feet. She takes medication and she experiences side effects. The medication makes her feel tired. She stated that she broke her knees and back. She experienced a recent fall in Georgia that occurred in January 2022. She stated that prior to the fall she was already limited in walking. She stated that she can sit for ten to fifteen (10 to 15) minutes without pain. *She stated that she needs to use a walker. She needs to use a wheelchair.* She cannot put pressure on her back. She had surgery on her leg. She has experienced mini strokes, and this has caused memory issues. . . . She has balance issues.

She takes medication for depression and anxiety. She has been using a wheelchair since January 2022. (Hearing Testimony)

R. 82-83 (emphasis added). The ALJ summarized medical records regarding Plaintiff's neuropathy in her feet due to diabetic complications from Type 2 diabetes—sometimes described as "uncontrolled"—and arthritis in her toes:

> [O]n September 26, 2019, the claimant presented . . . due to right foot pain. (Exhibit 12F/286) An X-Ray report of the right foot showed mild chronic appearing degenerative arthritic changes in the small toes . . . . The claimant stated that she noticed her feet were becoming discolored. She smoked around a half pack of cigarettes a day. She reported that she had a history of two transient ischemic attacks in December 2018 and July 2019. (Exhibit 1F/3) . . . There was no evidence of any lower-level edema noted. . . . She did have a small dime-sized plantar pressure wound on the fifth metatarsal joint. . . . Her sensation is slightly diminished due to peripheral diabetic neuropathy. (Exhibit 1F/5) An image of the right foot revealed pressure ulcer to the right foot and type II diabetes neuropathy. (Exhibit 1F/6)
>
> On October 7, 2019, the claimant . . . underwent a sharp debridement of her ulceration removing a small one (1) mm core in the right foot. (Exhibit 1F/15) A physical examination showed that the claimant ambulated in normal shoe gear. There were no signs of any lesions. There was some discoloration and increased erythema in the right foot. The claimant was instructed regarding proper management of sugars, quality of shoe gear and monitoring the feet daily. (Exhibit 1F/17) On October 21, 2019, the records indicated that the claimant would benefit from bilateral lower extremity angiography. (Exhibit 1F/28)

R. 83-84. The ALJ also detailed the records of Plaintiff's stent placement and bypass surgery in her right leg that caused numbness:

> On October 29, 2019, the claimant . . . underwent a stent placement in the right superficial femoral artery. (Exhibit 1F/32) On December 20, 2019, . . . the records indicated echocardiographic findings consistent with patent foramen ovale (PFO) and mitral regurgitation (MR). (Exhibit 3F/6) A physical examination showed normal cardiovascular findings. There was trace edema. In addition, the

lower extremities were cold. (Exhibit 3F/7) Her ejection fraction was fifty to fifty-five percent (50 to 55%). (Exhibit 3F/8)

On January 4, 2020, the claimant sought emergency care . . . for an evaluation of right lower extremity discoloration, pain, and numbness. (Exhibit 3F/25) While admitted, on January 7, 2020, the claimant underwent right lower extremity femoral popliteal bypass procedure with a propaten graft. . . . On January 9, 2020, she was discharged home in stable condition. (Exhibit 3F/26)

On January 30, 2020, the claimant returned . . . and . . . physical examination showed a small open wound and minimal drainage in the right groin. (Exhibit 3F/185) . . . On September 3, 2020, . . . her right medial thigh wound had healed completely and no longer draining any fluid. She stated that her claudication improved. She continued to smoke cigarettes. (Exhibit 12F/9) . . . On June 2, 2021, the claimant presented to Brevard Health Alliance with complaint of cerebral vascular assault and peripheral arterial disease. Her physical examination was unremarkable. (Exhibit 24F/8)

R. 84. The ALJ additionally summarized the medical records for treatment of

Plaintiff's cervical spine and hip pain complaints:

On June 1, 2020, the claimant presented to Dr. Frank Cater [at North Jefferson Medical Center] and complained of left hip pain. An X-Ray of the hip showed good joint space. (Exhibit 4F/4)

On June 23, 2020, the claimant sought emergency care . . . [for] weakness on the right side arm and leg. She claimed that she had some mild slurred speech and altered mentation. A computed tomography (CT) of the head was unremarkable. MRI of the brain showed chronic change, but no acute infarct. A CT of the head and neck showed atherosclerotic change but no significant stenosis. . . . MRI of the cervical spine showed thickening of the posterior longitudinal ligament. Degenerative disk disease with cervical spondylosis but no cord compression. The claimant was advised to use a walker at home. The claimant was diagnosed with right-sided weakness may be related to cervical spondylosis, stroke was ruled out. (Exhibit 6F/6)

On July 7, 2020, the claimant . . . had some discomfort on full extension of the neck. She had pain with range of motion of her right shoulder and hips. She had good strength in deltoids, biceps, triceps, wrist extensors, writs flexors and hand grip. She appeared to have good strength in iliopsoas, quadriceps, hamstrings, foot dorsi and plantar flexors. . . . A MRI scan of the cervical spine showed multi-level

disease, mainly in C5-C6, C6-C7. The C6-C7 level was the worst, with central and rightward disc protrusion. At C5-C6, there was bilateral disc bulging. The claimant appeared to have a component of some ossification of posterior ligament. (Exhibit 11F/6)

On July 27, 2020, the claimant presented to [Dr. Carter at] the North Jefferson Medical Center and the records indicated that the claimant was ambulatory and using her cane. (Exhibit 10F/5) In a follow-up appointment, on August 24, 2020, the claimant stated that she felt a bit unsteady and had a fall and a couple of near falls. She was using a cane to walk and considering going to a walker instead. (Exhibit 11F/2)

On September 23, 2020, the claimant . . . complained of midline cervical pain. A physical examination showed . . . no evidence of peripheral edema. (Exhibit 14F/3). . . . There was decreased range of motion with tenderness to palpation bilateral cervical facets. There was tenderness [] present over the facet margins bilaterally. Motor strength was four out five (4/5) generally. There were diminished reflexes in the cervical spine. Her gait was antalgic. (Exhibit 14F/4)

On January 13, 2021, a physical examination showed that the claimant ambulated normally. She displayed normal gait and station. (Exhibit 17F/9)

On July 24, 2021, Dr. Steven Gallas examined the claimant in a consultative examination at the request of the Administration. . . Regarding the back, there was no evidence of deformity, muscle spasm or tenderness. Straight leg raising was normal in seated and supine positions. Regarding extremities, there were no deformities, swollen joints, wounds, or ulcers. Neurovascular findings were normal in the right and lower extremities. . . Normal light touch and pinprick sensation except little to no sensation in the right leg below patella. She had no difficulty getting on and off the examination table. She was unable to do tandem walking, walking on heels, walking on toes, and squatting/rising due to right leg numbness. *There was mild antalgic gait with right sided limp. The claimant did not use an assistive device to ambulate*. (Exhibit 22F)

On August 17, 2021, an X-Ray report of the cervical spine showed spondylitis disease from C3-C4 through C6-C7. There was degenerative change of the atlantoaxial articulation. Soft tissue calcifications in the neck adjacent to the cervical spine. (Exhibit 25F)

R. 84-86 (emphasis added).

Based on a review of the record as a whole, the Court finds that the ALJ's summary of Plaintiff's responses on the administration forms and her hearing testimony accurately reflected Plaintiff's statements about her subjective complaints. The ALJ considered Plaintiff's statements that she needed to use a cane prior to January 2022, when she fell a month before the hearing and began using a wheelchair. Plaintiff testified that her ability to walk was limited (R. 109-10); she could sit without pain for only "maybe" 10-15 minutes, and she used a walker and wheelchair because she was unable to put any weight on her knee or pressure on her back (R. 110-11); a leg by-pass made her leg numb from the knee down (R. 111); and she had used a walker or cane since 2020 (before her January 2022 fall). (R. 115-17).

The ALJ also properly considered the medical records, including X-rays, treatment and assessment notes regarding Plaintiff's impairments to partially discount Plaintiff's complaints:

> [T]he medical evidence of record supports the presence of physical and mental impairments reasonably [] expected to cause the types of symptoms that the claimant alleges, but not to the full extent to which she alleges them. Therefore, the undersigned find the claimant's subjective complaints to be partially consistent with the evidence of record.

R. 87. The ALJ noted that Plaintiff had undergone surgery and received a stent for peripheral vascular issues in her right lower extremity which "the record reflects that the surgery was generally successful in relieving the symptoms" and "after four weeks" from the January 2020 surgery, "she was stable." (*Id.*). The ALJ specifically

noted from the follow up visit in February 2020—two years before the ALJ's hearing:

> [Plaintiff] reported continued smoking and reported numbness in bilateral lower extremity and neuropathy. (Exhibit 12F) She was encouraged to stop smoking and increase walking to improve function. (Exhibit 12F). From December 2019 until after her recovery period from the graft, the claimant had mobility issues due to claudication and dyspnea on exertion. She had surgery without complications in January 2020 and proceeded with physical therapy and occupational therapy to assist with gait, balance, mobility. Her estimated recovery period was four (4) weeks. Unfortunately, the claimant developed an abscess as a complication from smoking and diabetes mellitus. By September 2020, she was healed. *There was no indication from hospital records that hand-held assistive device was necessary after her recovery from the graft and wound.*
>
> In early 2020, the claimant stated complain[ts] of bilateral knee and hip pain to her provider [Dr. Carter] at North Jefferson Medical Center. (Exhibits 4F and 13F) *She was noted as having arthritis, but there is no imaging to support that except for minimal arthritis in her right foot from a prior examination from a hospital in 2019.* (Exhibit 1F)
>
> By July 27, 2020, the claimant was noted as using a cane in the treatment notes. However, the claimant was also recovering from a wound abscess following the graft at that time. The doctor noted that there was no significant or remarkable physical examination findings except for noted reported tenderness in hip or knees when palpated. (Exhibit 10F) Her gait, station, muscle strength and range of motion were not noted in the treatment notes. Other objective findings indicated her diabetes mellitus was stable. (Exhibit 10F) Her last visit there was in September 2020. *As of this date, there no indication in the treatment notes to support a hand-held assistive device [or] hand-held assistive device was necessary.*
>
> In August 2020, the claimant reported using a cane to Dr. Robert Abramson. (Exhibit 11F/2) She was referred for neurology follow-up after discharge from Doctor's Hospital where she had complained of right sided weakness but CVA was ruled out. (Exhibit 6F/6) The hospital noted the weakness was likely related to cervical spondylosis and she was advised to use a walker at home and referred to neurology. (Exhibit 6F/6) The doctor performed a physical examination and *had unremarkable findings in terms of actual strength, reflexes, and range*

*of motion. The claimant complained of pain or discomfort.* (Exhibit 11F/6) Surgery was not indicated, she was referred for lumbar MRI, *and treatment was conservative. The claimant did not return for further treatment.*

In November 2020, the claimant began treatment at Florida Community Health Centers. (Exhibit 15F, 17F and 18F) Through January 2021, the records indicated *the claimant was ambulating normally. Her gait and station were also normal.* (Exhibit (17F/9-15 and 18F/12-18) *Treating notes do not indicate that a hand-held assistive device was medically necessary.*

Upon examination for the consultative examination on March 29, 2021, the claimant appeared with a walker to ambulate. *However, the doctor opined she was able to ambulate, balance, stance, and gait with an antalgic gait.* Even though the report found the claimant was limited to sedentary work-part time, *the specific findings and comments concerning gait, station and ambulation suggest the hand-held assistive device is not medically necessary.* Further, more recent medical visits *showed the claimant had normal gait, strength at 5/5 at all extremities and sensation intact.* (Exhibit 21F/6 [R. 1363-70]) On June 22, 2021, the claimant was admitted to Parrish Medical Center for headaches and loss of vision with history of transient ischemic attack (TIA). (Exhibit 21F) She was discharged after a neurological consultation who advised there was no acute CVA and "nothing to do." (Exhibit 21F/4 [R. 1368]) She had a right foot fracture at distal pharynx of right first digit but *also found to have neurologically normal gait, strength at 5/5 in all the four extremities, normal tone, and sensation intact.* (Exhibit 21F/6)

In June 2021, the claimant began treating at Brevard Health Alliance. (Exhibits 24F and 26F) *The medical records do not indicate any use of a hand-held assistive device or medical necessity for one.* The physical examination was also unremarkable except for decreased strength in right upper extremity. *There was no[] mention of any musculoskeletal abnormalities or problems with gait or station.* . . .

The facts in the record do not dispute that the claimant has conditions, which singly or in combination, may cause her pain and other difficulty. *What these pieces of evidence suggest is that the claimant's symptoms may not be accurately reported, may not exist at the level of severity assumed by the claimant's testimony at hearing and may have other mitigating factors against their negative impact on the claimant's ability to engage in work activity.* The above residual functional capacity, as determined by the undersigned, gives adequate weight to the facts as determined to be consistent with the evidence.

> The medical evidence of record is void of objective evidence to support
> a more restrictive residual functional capacity.

R. 88-89 (emphasis added). The ALJ specifically discussed and rejected Dr. Carter's

July 2020 suggestion that Plaintiff use a cane, and the suggestion of a walker from

Dr. Ujjin around the same time (June 2020), as inconsistent with the other medical

evidence:

> On June 24, 2020, Dr. Ruj Ujjin advised that the claimant use her
> walker at home. (Exhibit 6F/6) The medical opinion is not persuasive
> due to the lack of consistency and supportability with the record. The
> doctor's statement was precautionary and the claimant was referred to
> a specialist for a follow-up. The claimant attended a follow-up
> appointment and her records did not indicate a hand-held assistive
> device was medically necessary. On June 24, 2020, the claimant was
> discharged from Doctor's Hospital after complaining [of] right sided
> weakness. CVA was ruled out. The weakness was likely related to
> cervical spondylosis. She was advised to use a walker at home (6F/6).
> Upon follow-up from this discharge with Dr. Abramson, MD, there was
> nothing significant noted in his assessment to indicate that a cane or
> walker was medically necessary. (Exhibit 11F)
> On July 27, 2020, Dr. Frank Carter suggested that the claimant
> maybe use a walk based on her subjective symptoms of knee pain, hip
> pain, and chronic vertigo. (Exhibit 10F/5 and 13F/4) The undersigned
> found the medical opinion not persuasive based on the lack of
> consistency and supportability with the record. In early 2020, the
> claimant started to complain of bilateral knee and hip pain to her
> provider at North Jefferson Medical Center. (Exhibits 4F and 13F) She
> was noted as having arthritis, but there is no imaging to support that
> except for minimal arthritis in her right foot done at Augusta University
> Medical College Hospital in 2019. By July 27, 2020, she was noted by
> Dr. Carter as using a cane. There are no significant or remarkable
> physical examination findings except for noted reported tenderness in
> hip or knees when palpated. (Exhibit 10F) Her gait, station, muscle
> strength, range of motion, etc. is not noted in the treatment notes. Other
> objective findings indicated her diabetes was stable. (Exhibit 10F)

R. 90.

Overall review of the relevant medical records indicates that, although at times Plaintiff required a cane or walker while recovering from surgery or short-term medical issues, the ALJ repeatedly noted the physical examination findings by Plaintiff's healthcare providers and the consultative examiner, who found Plaintiff had normal gait and strength in the extremities and "no problem" with her gait as of late 2021. R. 1363-70. Accordingly, substantial evidence supports the ALJ's decision. *See, e.g., Moore v. Barnhart*, 405 F.3d 1208, 1213 (11th Cir. 2005) ("To the extent that . . . other evidence . . . undermine[s] the ALJ's RFC determination, [plaintiff] misinterpret[s] the narrowly circumscribed nature of our appellate review, which precludes us from 're-weigh[ing] the evidence or substitut[ing] our judgment for that [of the Commissioner] . . . even if the evidence preponderates against' the decision." (footnote omitted)).

The ALJ clearly considered the record in detail as a whole, including all of the medical evidence following Plaintiff's treatments for diabetic skin complications and the bypass procedure for vascular issues, as well as wound recovery after treatment, in determining that the claimant was not disabled. *See Howard v. Soc. Sec. Admin., Comm'r*, 566 F. App'x 784, 787 (11th Cir. 2014) ("even if the AC improperly failed to consider some of [the plaintiff's] additional evidence, any error was harmless because we have independently reviewed all submitted evidence.").

**B. Dr. Singh's Consultative Report**

The ALJ found at Step 2 that Plaintiff had the severe impairment of anxiety but her depression was not severe because it did not cause more than minimal limitation in her ability to perform basic work activities. R. 79-80. While the ALJ did not find that the severity of Plaintiff's mental impairments equaled a Listing, the ALJ did find that Plaintiff had mild limitations in understanding, remembering, or applying information, adapting or managing oneself; and moderate limitations in interacting with others and in concentrating, persisting, or maintaining pace. R. 81. Therefore, the ALJ included the following mental limitations in Plaintiff's RFC: Plaintiff is limited in her ability to understand, remember, carry out simple, routine, rote or repetitive tasks, and interact with the general public occasionally. R. 89. The ALJ noted in discussing Plaintiff's RFC that she had reported mental health symptoms at the hearing but found that the "record was not supportive of any marked mental limitations" (R. 89), providing specific descriptions of Plaintiff's functioning in discussing the extent of the limitations. *See* R. 81. The ALJ found that the clinical mental health notes showed that Plaintiff's mental status examinations were consistently unremarkable. R. 89.

Plaintiff argues that the ALJ, in determining the mental limitations in her RFC, erred in evaluating and in finding unpersuasive the opinion of Dr. Singh, a psychologist who performed a consultative examination of her in July 2021. (Doc. 26 at 21). The Commissioner responds that the ALJ properly analyzed Dr. Singh's opinion and the ALJ's finding is supported by substantial evidence. (Doc. 22 at 21-

24). Magistrate Judge Lambert determined in the R&R, applying the amended Regulations in place at the time Plaintiff filed her claim (*see* 20 C.F.R. §§ 404.1520c, 416.920c), that the ALJ specifically considered Dr. Singh's opinion, found it unpersuasive, and adequately addressed the supportability and consistency of Dr. Singh's opinion. (Doc. 25 at 20 (citing R. 86-87, 92)). She found that the evidence the ALJ relied on when making the findings at Step 2 regarding Plaintiff's mental impairments, and in her explicit consideration of Dr. Singh's opinion, were sufficient to conclude the ALJ's finding was supported by substantial evidence. (*Id.*)

Plaintiff now contends, in objecting to the Magistrate Judge's R&R, that the ALJ erred in rejecting Dr. Singh's opinion about Plaintiff's moderate mental impairments because it was based on Plaintiff's "subjective statements," without the ALJ citing evidence from the record that contradicted Dr. Singh's opinion. Plaintiff contends that the ALJ should not have discounted Dr. Singh's opinion because the Administration had requested his opinion, and the ALJ failed to explain why it was not persuasive when, as a psychologist, Dr. Singh would be entitled to support his opinion based on a patient's subjective statements. (Doc. 26 at 22 (citing *Thompson v. Berryhill*, No. 4:18-CV-133-FL, 2019 WL 2980030 at *12, 2019 U.S. Dist. LEXIS 113691 at *32 (E.D.N.C. Apr. 22, 2019) (finding that an ALJ's rejection of a psychiatrist's opinion on the grounds that it relies on a plaintiff's subjective statements "raises the specter" that the ALJ is "impermissibly making a medical judgment" because "[p]sychology and psychiatry necessarily rely on such subjective

reports because the types of disorders they deal with are not usually susceptible to direct physical observation as in other medical arenas.")).

Plaintiff points specifically to Dr. Singh opining that: Plaintiff would not be able to manage her funds if awarded due to memory problems; her impairments moderately limited her functionality; and his note that Plaintiff had observable signs of skin lesions that she attributed to anxiety. (Doc. 26 at 22 (citing R. 1414)). She argues that the ALJ did not adequately explain the basis for discounting Dr. Singh's consultative opinion that Plaintiff was moderately impaired since providers noted in her treatment records that she had recurrent moderate major depressive disorder and anxiety. (*Id.* (citing R. 759, 1437, 1442)).

Judge Lambert set forth the correct Social Security Regulations ("SSR") the ALJ was required to apply at the time Plaintiff filed her application. *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01, 5844 (Jan. 18, 2017); 20 C.F.R. §§ 404.1520c; 416.920c ("[f]or claims filed . . . on or after March 27, 2017, the rules in [§§ 404.1520c; 416.920c] apply."). Under the revised regulations, the ALJ no longer "defer[s] or give[s] any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [] medical sources." *Id.* §§ 404.1520c(a), 416.920c(a). Rather, the Commissioner must "consider" the "persuasiveness" of all medical opinions and prior administrative medical findings. *Id.* To that end, the Commissioner considers five factors: (1) supportability; (2) consistency; (3) the source's relationship with the claimant; (4) the

source's area of specialization; and (5) any other relevant factors which "tend to support or contradict a medical opinion or prior administrative medical finding." *Id.* §§ 404.1520c(c); 416.920c(c).

The most important of these factors are supportability and consistency, and the ALJ must explain the consideration of those two factors. *Id.* §§ 404.1520c(a), (b)(2); 416.920c(a), (b)(2). Supportability refers to the extent to which a medical source has articulated support for a medical source's own opinion and consistency refers to the extent to which the provider's opinion conforms to other evidence in the record. *Id.* at §§ 404.1520c(c); 416.920c(c); *Barber v. Comm'r of Soc. Sec.*, No. 6:20-cv-1222-LRH, 2021 WL 3857562, at *3 (M.D. Fla. Aug. 30, 2021) (citation omitted). The ALJ may, but is not required to, explain how she considered the other factors (*i.e.*, relationship with claimant, specialization, and "other factors"). 20 C.F.R. §§ 404.1520c(b)(2); 416.920c(b)(2). In assessing the supportability and consistency of a medical opinion, the regulations provide that the ALJ need only explain the consideration of these factors on a source-by-source basis—the regulations themselves do not require the ALJ to explain the consideration of each opinion from the same source. *Id.* §§ 404.1520c(b)(1); 416.920c(b)(1).

The ALJ summarized Dr. Singh's evaluation notes:

[O]n July 27, 2021, Dr. Binny Singh evaluated the claimant in a consultative evaluation at the request of the Administration. The claimant reported that she [received] treatment for depression and anxiety in her thirties. She was prescribed medication and received individual counseling services. She denied the current receipt of treatment. She denied a history of psychiatric hospitalizations. The claimant stated that she was able to complete light household chores and watches television. A mental status examination showed that the claimant was oriented to time, person, place, and purpose

of the evaluation. She did not demonstrate fine motor tremors. She walked slowly with a limp. She was dressed casually with adequate hygiene. She maintained appropriate eye contact and was cooperative towards the examiner. She presented with euthymic mood and congruent affect. Her expressive and receptive language skills appeared below average. She spoke slowly and appeared to have difficulties finding words. Her thought processes were logical with appropriate content. Her attention and concentration evidenced deficits. She correctly spelled the word "world" forwards and backwards. She correctly counted to forty by multiples of three slowly with errors She evidenced impairments in memory functioning. She recalled three of three words immediately and one of three words after a two-minute interval. Her recent and remote memory recall appeared intact. She denied thoughts of hurting herself and others. She denied symptoms of psychosis and did not evidence perceptual disturbances during this evaluation. Her insight, judgment, and impulse control all seemed fair based upon information obtained at this evaluation. (Exhibit 23F) On December 1, 2021, the claimant presented to Brevard Health Alliance and denied depression and anxiety. (Exhibit 26F/17) Her mental status examination was unremarkable. (Exhibit 26F/18)

On December 1, 2021, the claimant presented to Brevard Health Alliance and denied depression and anxiety. (Exhibit 26F/17) Her mental status examination was unremarkable. (Exhibit 26F/18).

On January 11, 2022, the claimant presented to Brevard Health Alliance . . . [and] requested to be placed on medication for depression and anxiety. (Exhibit 26F/11) . . .

At the hearing, the claimant reported mental health symptoms but the record is not supportive of any marked mental limitations. Specifically, clinical notes show that the claimant's mental status examinations were consistently unremarkable.

R. 86-87. The ALJ determined that the medical evidence supported the presence of mental impairments reasonably expected to cause the types of symptoms that Plaintiff alleged, but not to the full extent to which she alleged them, and her subjective complaints were partially consistent with the evidence of record. R. 87. The ALJ explained her discounting of Dr. Singh's opinion:

On July 27, 2021, Dr. Binny Singh evaluated the claimant in a consultative evaluation at the request of the Administration. The doctor stated that the claimant was not capable of managing her funds based on her reported memory problems. Social functioning was mildly impaired based on her reported interactions. Functional ability was moderately impaired based upon her reported symptoms. (Exhibit 23F)

The undersigned found the medical opinion of Dr. Singh not persuasive based on a lack of consistency and supportability with the record. The doctor apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported.

R. 92. The ALJ detailed the reasons she partially discounted Dr. Singh's opinion based on his uncritical acceptance of Plaintiff's reported limitations which were contradicted by the unremarkable mental status findings in other contemporaneous medical records. Additionally, as Judge Lambert pointed out in the R&R, one of Dr. Singh's July 2021 findings—that Plaintiff was "not capable of managing her funds based on her reported memory problems" (R. 1414)—was directly contradicted by Plaintiff's own report from a month prior on an SSA self-report form that she was able to pay bills, count change, handle a savings account, "use a checkbook/money orders," and that "this had not changed since her illness began." R. 408, 412. The ALJ's reasons for discounting Dr. Singh's consultative opinion were based on substantial evidence.

**C.     Objections Related to the VE's testimony**

1. *VE's testimony*

Plaintiff argues that the VE's testimony did not constitute substantial evidence to support the ALJ's finding at Step 5 that Plaintiff could perform other jobs in the national economy because the VE did not volunteer the source for the number of jobs that the ALJ

found Plaintiff could perform, citing *Biestek v. Berryhill*, 587 U.S. _, 139 S. Ct. 1148 (2019). The Commissioner argues that Plaintiff's counsel did not object or inquire of the VE about this issue at the administrative hearing, and the VE's testimony regarding the number of jobs available in the national economy was substantial evidence supporting the ALJ's Step 5 finding.

Plaintiff now concedes that proceedings "might have been more efficient" had her counsel raised an objection to the VE's jobs testimony at the hearing, but she argues that she did not need to object at the hearing to preserve error because "the ALJ bears the Step 5 burden to probe about the vocational expert's methodology." (Doc. 26 at 12). She argues that the record here fails to demonstrate where the VE obtained the jobs numbers that he relied upon, or the methodology he used to reach his conclusions. Thus, she argues, the record is incomplete to meet the substantial evidence threshold because the VE testimony lacks the markers of reliability regarding the job numbers "except for saying they were consistent" with the Dictionary of Occupational Titles[3] ("DOT"). She argues that if there is a conflict between occupational evidence provided by the VE and information in the DOT, the ALJ cannot rely on the VE's testimony. As applied in this case, Plaintiff argues that the DOT "does not estimate how many positions exist in the national economy for each job title" and cannot be used to analyze current job numbers, citing cases in which

---

[3] The DOT is an "extensive compendium of data about the various jobs that exist in the United States economy[, including] information about the nature of each type of job and what skills or abilities they require." *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1357 n.2 (11th Cir. 2018).

the VE cited sources in addition to the DOT. (Doc. 26 at 5). She argues that it was not clear what, if any, job-number sources the VE was referring to at Step 5, as neither a source nor method for estimating jobs was entered into evidence so ultimately there was "no real explanation in the record" to draw a "job number position" from the evidence and the ALJ's findings.

Plaintiff further argues that, because the VE did not testify about the job data sources in the record, his testimony was in "obvious or apparent" conflict with job information provided in the DOT, and because both "the ALJ and VE should have known the DOT is not a source of job numbers, citing it alone is not substantial evidence of jobs at Step 5," the VE's testimony was "incomplete on its face," and the sources a "complete mystery." (*Id.* at 7-9, 13). Plaintiff similarly objects that the R&R "does not identify anything in the record th[at] could possibly serve as a basis for the job numbers at issue . . . aside from the DOT, nor was any method provided or described that used those sources." (*Id.* at 13-15).

The ALJ may use a VE's testimony to determine whether the claimant has the ability to adjust to other work in the national economy. *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004), *superseded on other grounds by* 20 C.F.R. § 404.1520c. Work exists in the national economy when it exists in significant numbers either in the region where the claimant lives or in several other regions of the country. 20 C.F.R. § 404.1566(a). The VE "is an expert on the kinds of jobs an individual can perform based on his or her capacity and impairments." *Phillips*, 357 F.3d at 1240. The ALJ, relying on

the VE's testimony, determines whether a specific number of jobs constitutes a significant number. 20 C.F.R. § 404.1560(c); *see Phillips*, 357 F.3d at 1240. If the SSA makes that showing, then the burden shifts back to the claimant to show that she is unable to perform the jobs suggested by the SSA. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

Based on a *de novo* review of the Record in the case, the Court finds that the VE was well-qualified (*see* R. 485-87), Plaintiff stipulated to the VE's qualifications (R. 118), and when the VE testified regarding the number of available jobs, Plaintiff's counsel failed to ask any questions regarding the source of the job numbers provided. *See* R. 119-20. Here, the ALJ asked the VE whether there were other jobs a hypothetical individual could perform at the light exertional level, with certain postural and environmental limitations, as well as mental limitations, but "able to understand, remember, and carry out simple, routine, rote, or repetitive tasks, and can interact with the general public occasionally." R. 119. The VE responded:

> That hypothetical would still allow for office helper, DOT 239.567-010, light, SVP 2. Approximately 138,300 jobs nationally. Mail clerk, DOT 209.687-026, light, SVP 2. Approximately 47,400 jobs nationally. Bench worker, DOT 706.684-022, light, SVP 2. Approximately 33,500 jobs nationally.

R. 119.[4] Plaintiff's counsel did not object to these numbers at the hearing or ask for the source of the numbers. *Cf. Goode,* 966 F.3d at 1284 n.3 (noting that the ALJ curtailed

---

[4] The VE did *not* testify that the jobs numbers were from the DOT. *See* R. 119. To the extent that Plaintiff reads that into the VE's testimony (excerpted above from R. 119)—which operated as more of a list of the salient jobs data for the three DOT-defined jobs without reporting the

claimant's attempts during the hearing to question the VE about his flawed testimony with the incorrect number of jobs, and that it was "not a case in which the claimant failed to challenge or question the [VE's] methodology or job numbers").

When the ALJ modified the hypothetical individual's capacity for standing and/or walking to four hours out of an eight-hour workday, the VE testified it would "erode" or reduce the number of office helper jobs to 82,900 and mail clerk to 28,400 jobs (both nationally), but not the bench worker jobs which could be done with a sit/stand at will option. R. 120. Based on the VE's testimony, the ALJ made the following Step 5 findings:

> If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.11. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as
> • Office helper (DOT# 239.567-010) light exertional, with an SVP of two, there are approximately 138,300 jobs in the nation – however the vocational expert testified that the number of jobs would be eroded by forty percent (40%) to 82,900 jobs;
> • Mail clerk (DOT# 209.687-026) light exertional, with an SVP of two, there are approximately 47,400 jobs in the nation – however the vocational expert testified that the number of jobs would be eroded by forty percent (40%) to 28,400 jobs;
> • Bench worker (DOT# 706.684-022) light exertional, with an SVP of two, there are approximately 33,500 jobs in the nation.
> The vocational expert testified that the number of jobs in the office helper position (DOT number 239.567-010, light exertional, SVP of two)

---

specific source of the unchallenged job numbers—it is a red herring.

would be eroded by forty percent (40%) due to reduction in standing/walking requirement.

The vocational expert testified that the number of jobs in the mail clerk position (DOT number 209.687-026, light exertional, SVP of two) would be eroded by forty percent (40%) due to reduction in standing/walking requirement.

The vocational expert testified that the number of jobs in the bench worker position (DOT number 706.684-022, light exertional, with a SVP of two) would not have any erosion because the work can be done with sit/stand option at will. As a result, there will be no change in the job numbers.

The vocational expert testified what is generally permissible by employers in terms of absenteeism, off task behavior and customary work breaks. The vocational expert testified the opinion is based on professional experience, education, and training. . . . The vocational expert also testified there were no transferable skill to other sedentary exertional work based on his education and experience.

Finally, the vocational expert testified that his testimony concerning erosion was based on experience, training, and SSR 00-4p.

Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

R. 93-95.

In arguing that the ALJ should not have relied on the VE's testimony, Plaintiff essentially reads into the Supreme Court's decision in *Biestek v. Berryhill*, 139 S. Ct. 1148 (2019), a categorical rule that the VE should volunteer during the hearing the source from which the VE obtained the jobs numbers in order for the ALJ to properly rely on the VE's expert vocational testimony. Plaintiff misapprehends the holding of *Biestek*, where the Supreme Court determined that a VE's refusal to provide the private market-survey data

underlying her opinion regarding job availability, despite a request from the claimant's counsel, did not categorically preclude the expert's testimony from counting as "substantial evidence"; instead, whether supporting data constitutes substantial evidence for the ALJ to rely on depends on the facts of the particular case. *Id*. at 1156-57.

The Supreme Court provided an example—similar to the situation in this case—describing when a VE's testimony would constitute substantial evidence:

> Assuming no demand [for supporting data], a vocational expert's testimony may count as substantial evidence even when unaccompanied by supporting data. Take an example. Suppose an expert has top-of-the-line credentials, including professional qualifications and many years' experience; suppose, too, she has a history of giving sound testimony about job availability in similar cases . . . . Now say that she testifies about the approximate number of various sedentary jobs an applicant for benefits could perform. She explains that she arrived at her figures by surveying a range of representative employers; amassing specific information about their labor needs and employment of people with disabilities; and extrapolating those findings to the national economy by means of a well-accepted methodology. She answers cogently and thoroughly all questions put to her by the ALJ and the applicant's lawyer. And nothing in the rest of the record conflicts with anything she says. But she never produces her survey data. Still, her testimony would be the kind of evidence—far more than a mere scintilla—that a reasonable mind might accept as adequate to support a finding about job availability.

*Id*. at 1155 (internal quotations and citation omitted). This is not a case—like the Supreme Court's other example—of a "less-qualified expert" who fails to "produce such data" and "offer[s] testimony that is so feeble, or contradicted, that it would fail to clear the substantial-evidence bar." *Id.* at 1155-56.

The Commissioner cites a number of cases from the Eleventh Circuit (pre-*Biestek*) which have held over the years that the VE does not have to provide the data in support

of the expert testimony in order for the ALJ to rely upon it. (Doc. 22 at 9-10 (citing *Bryant v. Comm'r of Soc. Sec.*, 451 F. App'x 838, 840 (11th Cir. 2012) (explaining the "Social Security regulations provide that an ALJ may rely on a VE's knowledge and expertise, and they do not require a VE [to] produce detailed reports or statistics in support of her testimony" and holding the vocational expert's testimony constituted substantial evidence); *Pena v. Comm'r of Soc. Sec.*, 489 F. App'x 401, 402-03 (11th Cir. 2012) (explaining "the ALJ was entitled to rely upon the VE's testimony without requiring the VE to provide a comprehensive statistical explanation of how he arrived at the reduced job number figures" and holding the testimony constituted substantial evidence); *Leigh v. Comm'r of Soc. Sec.*, 496 F. App'x 973, 975 (11th Cir. 2012) (affirming the ALJ's reliance on vocational expert testimony and observing claimant did not offer any evidence controverting the testimony or object to the testimony); *Leonard v. Comm'r of Soc. Sec.*, 409 F. App'x 298, 301 (11th Cir. 2011) (explaining the vocational expert's "recognized expertise provides the necessary foundation for his or her testimony; no additional foundation is required" and holding the vocational expert's testimony constituted substantial evidence); *Hurtado v. Comm'r of Soc. Sec.*, 425 F. App'x 793, 795 (11th Cir. 2011) (concluding the ALJ did not err in relying on vocational expert's testimony in part where claimant "did not object to the VE's testimony or qualifications, offer any evidence controverting the VE's testimony, or even question the VE")).

The analysis in a case decided two years after *Biestek* is helpful here. *Bacon v. Commissioner of Social Security*, 861 F. App'x 315, 320 (11th Cir. 2021), held that the

VE's testimony constituted substantial evidence supporting the ALJ's finding regarding the number of jobs available in the national economy despite the plaintiff's arguments that the ALJ failed to resolve an apparent conflict between the VE's testimony and the DOT. The Eleventh Circuit panel in a per curiam opinion found that the ALJ's Step 5 finding based on the VE's testimony to the number of jobs available in the national economy for a certain DOT job (325,000) was significant and constituted substantial evidence. *Id*. at 320-21. As in this case, the only evidence presented to the ALJ regarding the availability of other jobs the plaintiff could perform was through the VE's testimony with the number available in the national economy, and the plaintiff failed to present the "other evidence" that he later proposed to the ALJ or Appeals Council. *Id.* at 320. The panel noted that he had not presented the evidence at the hearing, had not "object[ed] to the VE's testimony or inquire[d] further into her methodology," and had "stipulated that the VE was qualified to testify." *Id*. ("because the VE's testimony is the only evidence regarding the number of jobs available in the record, this Court is foreclosed from considering other evidence suggested by [the plaintiff] in the district court and on appeal"); *see Moore v. Saul*, No. 8:18-cv-2423-T-CPT, 2020 WL 814003 at *3-*4 (M.D. Fla. Feb. 19, 2020) (finding VE's testimony constituted sufficient evidence for ALJ's Step 5 finding regarding the number of jobs available where the VE indicated his testimony was consistent with the DOT and where the claimant "did not object to the VE's qualifications" or "request any supporting data for the VE's conclusion or challenge the reliability of his jobs number"); *Geisler v. Saul*, No. 5:18-CV-400-OC-JRK, 2020 WL 1243246, at *4 (M.D. Fla. Mar. 16, 2020)

(holding that the VE's testimony provided substantial evidence to support the ALJ's Step 5 findings where the claimant's counsel effectively cross examined the VE about his methodology and sources, counsel did not object to the VE's testimony during the hearing, and the record contained no evidence of the VE's level of reliance on skilltran data or other sources for the job numbers); *Smith-Russo v. Comm'r of Soc. Sec.*, No. 2:18-CV-630-MRM, 2020 WL 13954613, at *6 (M.D. Fla. Mar. 11, 2020) (holding where the claimant's attorney did not challenge the VE's qualifications, cross-examine the VE regarding discrepancies between the job numbers and the OES, or argue a conflict between the VE's testimony and the DOT, the VE's testimony was substantial evidence upon which the ALJ could rely); *cf. Ruenger v. Kijakazi*, 23 F.4th 760, 763-64 (7th Cir. 2022) (where claimant did challenge the job-number estimate and the VE was unclear about the compiling those estimates, the ALJ "must compel the [VE] to offer a reasoned and principled explanation of the methodology she used to produce the estimate").

In this case, Plaintiff has not disputed that the VE was well-qualified, and when the VE testified regarding the number of available jobs, Plaintiff's counsel failed to ask any questions regarding the source of the numbers provided or challenge the VE's methods.[5] The VE testified that he relied on his professional education and experience for his opinion about employers' toleration of absences, being off-task, and breaks. R. 121. The ALJ considered the VE's testimony and found, considering the claimant's age, education, work

---

[5] The only question Plaintiff's counsel asked the VE was whether, if Plaintiff required a walker for balance, if would preclude all jobs. R. 122.

experience, and RFC, that Plaintiff was capable of making a "successful adjustment to other work that exists in significant numbers in the national economy." R. 94-95. The VE's unchallenged testimony constituted sufficient evidence to support the ALJ's finding at Step 5 and Plaintiff's objection on this point is overruled.

   2.   *No conflict between the VE's testimony and the DOT at Step 5*

   Plaintiff argues that there was a conflict between the VE's testimony and the DOT and the ALJ violated Social Security Ruling 00-4p ("SSR 00-4p") by "failing to explore this issue" with the VE. (Doc. 26 at 16-17). According to SSR 00-4p, the ALJ has an affirmative duty to identify and resolve apparent conflicts between a VE's testimony and information in the DOT. SSR 00-4p, 65 Fed. Reg. 75759-01, 75760 (Dec. 4, 2000). If the VE's evidence appears to conflict with the DOT, the ALJ is directed to obtain a reasonable explanation of the apparent conflict. *Id*. Where the VE's evidence is inconsistent with the information in the DOT, the ALJ must resolve the conflict before relying on the VE's evidence to support a determination or decision that a claimant is or is not disabled. *Id.*

   Plaintiff argues that the ALJ's assessment that she could only stand and/or walk for 4 hours in an 8-hour day conflicts with the DOT's general description of "light work" and "[n]one of the three cited jobs contain more specific guidance on their respective standing requirements and the VE did not provide any basis in the testimony to accommodate this discrepancy." (*Id.* at 13-15). Plaintiff challenges the VE's testimony in this case as equating a "four-hour combined stand and walk restriction" to a "sit/stand option at will" and assuming standing in a confined area would be required, without testifying to any

specific job duties. (Doc. 26 at 17 (citing R. 120-22)). She argues that the ALJ-assigned RFC contains no language about changing positions or being able to sit/stand at will, and the VE described jobs that required standing in a confined space with some walking.

The Social Security Regulations provide that a job is in the "light work" category "when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b). In his testimony quoted *supra*, the VE specified three jobs—office helper, mail clerk, and bench worker—that the DOT provides are rated as "light work," which is defined as a job "requir[ing] walking or standing to a significant degree" or "sitting most of the time but entails pushing and/or pulling of arm or leg controls."[6] Plaintiff essentially argues that the VE's testimony was incomplete or vague because the VE did not first explain his reasons why the potential jobs he listed were in the subset of light work jobs that require no more than four hours total of standing or walking. (Doc. 26 at 19). She complains that the VE did not respond to the ALJ's inquiry by referring to his experience, or an explanation of the three jobs he listed.

The Commissioner argues that the ALJ reasonably relied on the vocational expert's testimony regarding the conflict between the DOT's description of the positions and Plaintiff's standing and walking limitations. The Commissioner argues that the ALJ properly identified the conflict between Plaintiff's standing and walking

---

[6] *See, e.g.,* 1991 WL 671813, § 209.687-026 (mail clerk).

limitations and explained the effect that limitations would have on the occupational

base, citing the VE's testimony regarding the erosion that Plaintiff's standing and

walking limitations would have, and noting that the vocational expert based his

testimony on his experience and training (Doc. 22 at 15 (citing R. 94)).

Contrary to Plaintiff's arguments that the VE failed to explain the

inconsistency, it is clear that the ALJ relied on the VE's testimony in the Step 5

finding (quoted *supra*) after asking the VE specifically if his testimony was

consistent with the DOT. R. 121. The VE responded:

> It's consistent with the DOT, however under SSR 00-4p the DOT lists
> the maximum expectant requirements of occupations and not the range,
> therefore a light duty job doesn't mean a person has to stand, walk, or
> lift. For example, a sewing machine operator may have no standing,
> walking, or lifting, and it's light duty due to physical effort, therefore
> the erosions are in line with the DOT, just not at the maximum level.

R. 121. The VE's testimony was sufficient to explain why there was not a potential

conflict between the ALJ's limitation that Plaintiff not stand and/or walk for more

than four hours in an eight-hour workday and the requirements of "light work." The

VE testified that the reduced number of jobs available based on the ALJ's

hypothetical restriction and clarified any apparent conflict with the DOT. Because

the VE provided a sufficient explanation on which the ALJ relied, the ALJ's decision

was based on substantial evidence.

Therefore, it is **ORDERED** as follows:

1.      The Report and Recommendation filed November 23, 2023 (Doc. 25)

is **ADOPTED** and **CONFIRMED** and made a part of this Order.

2.      Plaintiff's objections are **OVERRULED**.

3.      The final decision of the Commissioner of the Social Security Administration denying Plaintiff Elizabeth Ann Mowery's claim for Social Security Income is **AFFIRMED** pursuant to sentence four of 42 U.S.C. § 405(g).

4.      The Clerk is **DIRECTED** to enter judgment, accordingly, and **CLOSE** the case.

**DONE** and **ORDERED** in Orlando, Florida on March 4, 2024.

ANNE C. CONWAY
United States District Judge

Copies furnished to:

Counsel of Record